UNITED STATES of America, Plaintiff,

v.

**Felix Wayne MITCHELL, Nathan Charles Lewis, Morris McClendon, Marcus Wayne Edmundson, Alvin Gay, Donald Grogans, Randy Lamont Brown, a/k/a Randy Lamont Patterson, Billy Ray Brown, and Tony Louvell Burton, Defendants.**

**No. CR–83–0130 MHP.**

United States District Court,
N.D. California.

Oct. 4, 1983.

---

**26.** *See* letter of July 6, 1983 from William Greenawalt, counsel to East Europe.

Charles B. Burch, Joseph Burton, Michael D. Howard, George Niespolo, Asst. U.S. Attys., San Francisco, Cal., for plaintiff.

Robert Lyons, Hayward, Cal., Penelope Cooper, Berkeley, Cal., Richard Mazer, Gilbert Eisenberg, Filippelli & Eisenberg, San Francisco, Cal., Marcus Topel, Topel & Goodman, San Francisco, Cal., Paul D. Wolf, Oakland, Cal., John L. Williams, Jr., San Jose, Cal., William Osterhoudt, Colleen Rohan, Hallinan, Osterhoudt & Poplack, San Francisco, Cal., for defendants.

## ORDER

WEIGEL, District Judge.

On February 18, 1983, a Grand Jury of this Court returned an indictment against Felix Wayne Mitchell and eight other individuals. Defendants were charged with various offenses, including conspiracy to distribute heroin in violation of 21 U.S.C. § 846. On June 13, 1983, trial commenced before the Honorable William H. Orrick, Jr. Before and during trial, Mitchell was represented by Arlene West, who was designated as "lead counsel" for defendants. On July 6, 1983, the trial ended when defendants' motion for mistrial was granted under circumstances below set forth. Now before the Court are two motions, filed on behalf of all defendants, for (1) dismissal of the indictment due to alleged prosecutorial misconduct and (2) dismissal because retrial would violate the fifth amendment guarantee against double jeopardy.[1]

### A. Background.

The defense motions are based on events leading up to the mistrial motion involving

---

1. After mistrial, the case was reassigned to the Honorable Marilyn H. Patel. Due to a possible conflict of interest, Judge Patel disqualified herself from considering this motion, which thereafter was referred to this Court.

two Government witnesses and one prospective Government witness: Frederick Sanders, Norbett Bluitt, and Leslie Brigham. The Court now considers the pertinent events as to each.

### 1. Frederick Sanders

On June 20, 1983, trial testimony began with Sanders's direct examination by the Government. Cross-examination started the next day. In the morning of June 23, 1983, Arlene West cross-examined Sanders as to whether he had discussed his testimony with any of the prosecutors prior to trial. Sanders said he had not. During the noon recess, West asked Assistant United States Attorney Joseph M. Burton, who was trying the case for the Government, whether he had prepared Sanders before trial. Burton replied in the affirmative. West did not pursue the matter further in her cross-examination of Sanders. After West finished with the witness, Gilbert Eisenberg, attorney for defendant Donald Grogans, cross-examined Sanders. In response to pertinent questioning, Sanders again denied he had been prepared prior to trial.

█ On redirect, Burton did not ask Sanders about his pretrial preparation nor indicate in any way to the court or jury that Sanders had perjured himself.[2]

After Sanders was excused, the defense moved to strike Sanders's testimony, or for dismissal of the case, or for mistrial. The mistrial motion was subsequently withdrawn. On June 29, 1983, the court denied the motions to strike or for dismissal and also denied another defense motion to compel testimony from Burton. To settle the Sanders controversy, the court ordered the Government to make a statement to the jury about the nature and extent of Sanders's pretrial preparation, and granted de-

fendants an additional opportunity after the statement to cross-examine the witness. Burton announced to the jury that he had conferred with Sanders for 18 to 20 hours before trial and that Assistant United States Attorney Michael Howard and Department of Justice Special Attorney George Niespolo had also met with Sanders for an unspecified period of time. On further cross-examination, Sanders testified that the Government had prepared him for at least 40 hours. At the close of Sanders's cross-examination, the court again denied a defense motion to strike Sanders's testimony.

### 2. Norbett Bluitt

On April 14, 1983, the Government interviewed Leslie Brigham, a friend of Bluitt. Brigham indicated that West had represented Bluitt in the past. On June 1, 1983, Niespolo met with Bluitt, who stated he wanted to cooperate with the Government in this case. Bluitt also informed Niespolo that he had been represented by West. The Government asserts that it made its final decision to use Bluitt as a witness on or about June 9, 1983.

On June 24 and 25, 1983, after trial had begun, Burton, Niespolo, and F.B.I. Special Agent John Steiner met with Bluitt. Bluitt told them that it was Mitchell who had first put him in contact with West after Bluitt was charged with state assault, cocaine, and other offenses. West represented Bluitt from sometime in January or February, 1982 until May 17, 1983.

On June 30, 1983, the Government first disclosed to the defense that Bluitt would be called as a witness. The same day, West orally indicated to the court that her previous representation of Bluitt raised a conflict of interest with respect to her repre-

---

**2.** During a recess in Eisenberg's cross, Marcus S. Topel, attorney for defendant Randy Brown, asked Burton whether Sanders had been prepared. There is a conflict in the record as to Burton's answer. Topel claims Burton was noncommittal. Burton asserts he clearly told Topel that Sanders had been prepared. Department of Justice Special Attorney George Niespolo has corroborated Burton's version.

In any event, this conflict does not raise an issue of fact sufficiently material to mandate an evidentiary hearing. *See United States v. Irwin,* 612 F.2d 1182, 1187 (9th Cir.1980). The Government explains its failure to further reveal Sanders's preparation as stemming from fear that Sanders would continue to lie and further undermine his own credibility and the prosecution's case.

sentation of Mitchell. On July 1, 1983, West notified the court in writing that, should Bluitt testify, she might be forced to impeach him. West asserted that Bluitt's testimony would severely prejudice both Mitchell and herself.[3]

Consequently, defendants moved for dismissal, or for preclusion of Bluitt's testimony, or for mistrial, or for severance of Mitchell's trial from that of the other defendants.[4] On July 6, 1983, the court, after denying the dismissal motion, took an *in camera* offer of proof from defendants as to the areas in which West might impeach Bluitt, should she choose to take the stand. The court thereafter heard from the Government *in camera.* Proceedings subsequently reconvened in open court, and the court ruled that Bluitt could testify. However, the court barred him from testifying as to anything about which, based on its *in camera* review, the court concluded that West could impeach him. The court also denied the motion for severance and rejected a defense request that West be permitted to withdraw as counsel for Mitchell.

Defendants then renewed their motion for mistrial. The motion, unopposed by the Government, was granted.

### 3. *Leslie Brigham*

On April 14, 1983, Niespolo and I.R.S. Special Agent Michael Salmonson met with Brigham at his request. Brigham was then imprisoned in Oakland. Brigham discussed his contacts with Mitchell and other codefendants. As noted earlier, Brigham also stated that West had represented Bluitt.

On April 17, 1983, West visited Brigham in the Oakland City Jail. She signed in as Brigham's attorney. West claims that she

saw Brigham to discuss her representation of him in matters pending in Oakland Municipal Court. The same day, Niespolo and an Alameda County official conferred with Brigham, who indicated that he had conversed with West before they arrived. On April 18, 1983, the Government decided that Brigham would be used as a "supplemental witness at trial (Declaration of Joseph M. Burton In Support of Plaintiff's Opposition To Motion To Dismiss Indictment at 10). The Government also decided that Brigham should be placed in the Witness Protection Program. Accordingly, Brigham and his fiancee were transported to a safe location outside of Oakland.

Shortly thereafter, the two disappeared. On April 20, 1983, a material witness warrant was issued for Brigham. On May 10, 1983, he was apprehended in Oakland pursuant to the warrant. On May 17, 1983, Brigham's attorneys moved for his release. On May 19, 1983, the Government, in opposition to the motion, filed the declaration of F.B.I. Special Agent John Steiner ("Steiner Affidavit") *in camera* with the court. The Affidavit describes April 17, 1983 discussions between West and Brigham in which West attempted to persuade Brigham not to testify in this case. The Affidavit also states that West tried to obstruct justice by passing a note from Mitchell to Brigham, advising the latter not to cooperate with the Government. The court declined to unseal the Steiner Affidavit and to inform defendants of its contents. Not until August 2, 1983, upon the Government's filing of affidavits from Burton and Niespolo in opposition to the instant motion, did defendants become aware of the substance of the allegations against West contained in the *in camera* submission.[5]

---

**3.** According to West, Mitchell would have to choose between not impeaching Bluitt and losing his attorney via disqualification. West would be forced to choose between not testifying to the detriment of her client and taking the stand but facing disqualification thereafter. The record also suggests that Bluitt may also have implicated West in criminal wrongdoing. If West did not testify, she would have left unchallenged allegations potentially damaging to Mitchell.

**4.** The court subsequently appointed an independent attorney for Bluitt. Bluitt's new counsel advised the court, on July 5, 1983, that Bluitt would waive any privilege arising from his representation by West.

**5.** Defendants also moved for release of the Steiner Affidavit. On August 5, 1983, Judge Patel denied the motion. On August 18, 1983, this Court heard argument on a similar motion for release and referred the motion to Judge Patel, who granted the motion.

### B. *Findings of Fact and Conclusions on Defendants' Motions.*

#### 1. Motion to Dismiss for Prosecutorial Misconduct.

Defendants assert that the Government's conduct in connection with Sanders, Bluitt, and Brigham was so outrageous, as a matter of objective fact, that dismissal of the indictment is mandated as an exercise of the Court's "supervisory powers." While the defendants originally requested an evidentiary hearing before disposing of the motion, they have now stipulated with the Government that all facts relevant to the claim of prosecutorial misconduct are already evident from the record.

■ The Court may invoke its inherent supervisory powers to dismiss an indictment due to Government misconduct. *United States v. Ramirez,* 710 F.2d 535 at 541 (9th Cir.1983); *United States v. Owen,* 580 F.2d 365, 367 (9th Cir.1978). However, use of such powers is a harsh sanction, "frequently discussed but rarely invoked." *United States v. Samango,* 607 F.2d 877, 881 (9th Cir.1979); *see also United States v. Owen,* 580 F.2d at 367. Supervisory powers are to be employed against only the most flagrant and outrageous misconduct. *See United States v. Rasheed,* 663 F.2d 843, 853 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *see also United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir.1977).

■ Consequently, a court may not dismiss an indictment unless there is a "clear basis in law and fact" for such action. *Ramirez,* 710 F.2d at 541; *United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977). This Circuit has consistently noted that a party seeking invocation of the supervisory powers must demonstrate some prejudice stemming from the alleged misconduct, meaning that the misconduct must have "at least some impact on the verdict." *United States v. Owen,* 580 F.2d at 367–68 (quoting *United States v. Acosta,* 526 F.2d 670, 674 (5th Cir.), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976)).

■ The Supreme Court recently summarized the three purposes for which supervisory powers may be implemented: (1) to remedy violation of recognized rights; (2) to preserve judicial integrity by ensuring that a conviction rests on considerations properly before a jury; and (3) to remedy and deter illegal conduct. *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983); *see also Ramirez,* 710 F.2d at 541–42. The exercise of the Court's supervisory powers to dismiss the indictment in this case would not serve any of these purposes. Defendants have not shown that any of their constitutional, statutory or other rights were violated by the Government's conduct. This motion does not concern a conviction allegedly based on inappropriate considerations. And while the Government's conduct cannot be commended, it was not plainly illegal.

The sources of illegal Government conduct cited by defendants are the failure to reveal Sanders's perjury and the failure to notify the defense that Bluitt and Brigham would be called as witnesses. The Government did not move as quickly as it might have to disclose and correct Sanders's perjury, but Burton informed West, lead counsel for defendants, of the falsity of Sanders's statements immediately upon her inquiry. After Sanders was excused, Burton on behalf of the prosecution alerted the court to the perjury and, upon the court's order, the jury. Therefore, the Government discharged, albeit with less than model diligence, its ethical obligation to correct known perjured testimony. *See Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). As to Bluitt and Brigham, the Government was under no general obligation to disclose its intent to call these witnesses. Fed.R.Crim.P. 16 & Conference Committee Note (C); *United States v. Sukomolachan,* 610 F.2d 685, 688 (9th Cir.1980); *United States v. Angelini,* 607 F.2d 1305, 1308 (9th Cir.1979). Defendants argue that the Government nevertheless had an obligation under the circum-

stances to alert them to its intent to call these witnesses, since their testimony would create a conflict of interest with respect to West's continued representation of defendant Mitchell. However, the Government's explanation for its failure to reveal its intention to call these witnesses, that such disclosure could have endangered the witnesses and could have impeded their testimony, is sufficiently reasonable to prevent the Government's action from being illegal.

Moreover, the defendants have not shown the type of prejudice that would be necessary to sustain a supervisory dismissal of the indictment. The cumulative effect of Sanders's perjured testimony and the problems created by the calling of Bluitt and the prospective calling of Brigham was a mistrial. Thus, no verdict was affected in any way by the challenged Government actions. *See United States v. Owen,* 580 F.2d at 367–68.

Defendants have cited no cases in which an indictment has been dismissed due to conduct resembling that of the Government here. In fact, decisions in analogous cases suggest that dismissal would be wholly inappropriate. *See, e.g., United States v. Bensabat,* 568 F.2d 1226 (5th Cir.), *cert. denied,* 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978); *United States v. Jeffers,* 520 F.2d 1256 (7th Cir.1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976). The Government's actions did not display the type of reneging on an agreement or vindictiveness that has characterized cases in which indictments have been dismissed. *See, e.g., United States v. Carrillo,* 709 F.2d 35 (9th Cir.1983); *United States v. Currie,* 667 F.2d 1251 (9th Cir. 1981); *United States v. Alvarado-Sandoval,* 557 F.2d 645 (9th Cir.1977).

Over-all, there is no clear basis in law or in fact for dismissal of the indictment pursuant to the Court's supervisory powers. *See Ramirez,* 710 F.2d at 541; *United States v. Chanen,* 549 F.2d at 1313. Defendants' motion to dismiss on grounds of Government misconduct and their request for an evidentiary hearing on that issue is denied.

### 2. *Motion to Dismiss Because of Double Jeopardy.*

■ The second defense motion to dismiss is based on the claim that retrial of the defendants is now barred by the Double Jeopardy Clause of the fifth amendment. The defendants recognize that in the situation here presented, where a mistrial has been granted upon defense motion, a "consent" exception to the double jeopardy rule generally permits reprosecution. *See United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion). The defendants nevertheless advance a two-pronged argument to support their contention that the double jeopardy bar applies in this case. They argue, first, that their motion for mistrial was not an effective consent to reprosecution because the motion was made while the defense was unaware of certain material facts.[6] The defendants maintain they would not have moved for a mistrial had they known the true situation, that their consent to reprosecution is therefore "vitiated," and that the mistrial should be treated as one granted *sua sponte* by the court, so that reprosecution may be permitted only if mistrial was required by "manifest necessity." *See Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978). Secondly, should this Court decline to accept this reasoning, the defendants contend that reprosecution is barred under the doctrine of *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), because the record and stipulated facts estab-

---

**6.** Specifically, the defendants were not informed and did not know that the April 17 contact between West and Brigham had been disclosed to the court *in camera* prior to trial in the form of the Steiner Affidavit. According to the defendants, the motion for mistrial was agreed upon by the defendants only because they believed that the prosecution should have made such an *in camera* disclosure, but did not. At the hearing before this Court, the Government stipulated that the defendants would not have moved for mistrial but for their mistaken belief concerning *in camera* disclosure, although the Government asserts that the mistrial motion was made for other reasons as well.

lish that the prosecution in the trial before Judge Orrick acted with the deliberate intent to provoke the defendants into moving for mistrial.

No authority supports the legal premise underlying the first prong of the defendants' argument. Defendants would have the Court rely principally upon *United States v. Martinez*, 667 F.2d 886 (10th Cir. 1981). In that case, the court held that the Double Jeopardy Clause prohibited reprosecution in a situation where the defendant had agreed to join in a mistrial motion without knowledge of all facts. *Id.* at 889, 890. In reaching its decision, however, the Tenth Circuit did not rely on the legal principle advanced by defendants here. Rather, the court upheld the double jeopardy bar because it agreed with the district court's finding that the prosecution deliberately induced the defendant to join the mistrial motion. *Id.* at 890.

■ In the absence of authority, the Court cannot accept defendants' position, particularly because defendants appear to misapprehend the significance of their election to move for mistrial. The sole interest protected by the Double Jeopardy Clause is the defendant's "valued right to have his trial completed by a particular tribunal." *See Oregon v. Kennedy*, 456 U.S. at 671–72, 102 S.Ct. at 2087 (citing *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949) and *United States v. Jorn*, 400 U.S. 470, 483–84, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971) (plurality opinion)). By moving for mistrial, the defendants evinced a willingness to forego that right. The Supreme Court has stated that where "the defendant himself has elected to terminate the proceedings against him, . . . the 'manifest necessity' standard has no place in the application of the Double Jeopardy Clause." *Oregon v. Kennedy*, 456 U.S. at 672, 102 S.Ct. at 2087. Under *Oregon v. Kennedy*, the "vitiated consent" exception to waiver of double jeopardy protection when the defendant moves for mistrial is "limited to

those cases in which the conduct giving rise to the successful motion for mistrial was intended to provoke the defendants into moving for a mistrial." *Id.* at 679, 102 S.Ct. at 2091. The first prong of defendants' argument therefore fails, despite the stipulation by the Government that defendants would not have moved for mistrial had they known of the pretrial *in camera* disclosure to Judge Orrick of West's contacts with Brigham and Bluitt.[7]

The second prong of the defendants' position rests upon the prosecutorial "intent to provoke mistrial" exception to waiver described in *Oregon v. Kennedy*. The legal premise of this contention is sound. The Court must determine from objective facts and circumstances whether the prosecution intended to provoke or goad the defendants into moving for mistrial. *Oregon v. Kennedy*, 456 U.S. at 675, 102 S.Ct. at 2088. All parties have agreed that the present record suffices for this determination, and that no further testimony or other evidence is needed.

To support their contention that the prosecution deliberately provoked the mistrial motion, the defendants point to the fact that the credibility of Sanders, an important Government witness, had been severely damaged by the revelation of his perjury. According to the defense theory, the Government from the start held Bluitt and Brigham in reserve, not announcing an intention to call them as witnesses, knowing that the spectre of disqualification, the difficulty of cross-examination owing to attorney-client privilege, and other problems arising from West's prior representation of and involvement with each would inevitably cause a defense motion for mistrial should Bluitt or Brigham be called during trial. The defense contends that the Government decided to call Bluitt and Brigham in order to cause a mistrial after Sanders was discredited before the jury. Thus, the defendants argue, inferences from the record show that the prosecution deliberately provoked the defense mistrial motion.

7. There is no need to consider whether the declaration of a mistrial was a "manifest necessity" under the circumstances of this case, and the Court makes no finding concerning that question.

The Court has considered the entire record, and cannot find that the prosecution acted with intent to provoke a mistrial motion. The Court is satisfied that the Government's reason for failing to disclose its intention to call Bluitt and Brigham was to protect these witnesses and to forestall any possible attempt improperly to influence their testimony.[8] The only relevant question here is whether the Government's entire course of conduct with respect to witnesses Bluitt and Brigham was intended to provoke a defense mistrial motion. The Court, based on the entire record, finds that the Government did not have that purpose. Although several acts of the prosecutors may constitute misconduct, the misconduct was not so blatant that the Government must have intended it to result in mistrial. *See United States v. Curtis,* 683 F.2d 769, 778 (3d Cir.1982); *United States v. Singletterry,* 683 F.2d 122, 125 (5th Cir.1982). The motion to dismiss the indictment on double jeopardy grounds is denied.

SO ORDERED.

---

8. As discussed above, the Steiner Affidavit referred to allegations by Brigham that defendant Mitchell, using West as an intermediary, attempted to persuade Brigham not to testify or to cooperate with the Government. This gave the Government a reasonable basis for fearing further attempts by the defendants to obstruct justice by interfering with the testimony of Bluitt and Brigham.